Darlene L. PRIDEMORE,
Plaintiff/Appellee,

v.

Larry CHERRY, Larry Cherry Trustee,
and Money Management Services,
Inc., Defendants/Appellants.

Court of Appeals of Tennessee,
Middle Section, at Nashville.

March 17, 1995.

---

Steve North, Mark North, Nashville, for plaintiff/appellee.

L. Anthony Deas, Madison, for defendants/appellants.

## OPINION

LEWIS, Judge.

Defendants/appellants Larry Cherry; Larry Cherry, Trustee; and Money Management Services, Inc.[1] appeal from the judgment of the trial court awarding plaintiff the sum of $50,000.00 compensatory damages and $25,000.00 punitive damages, after finding that defendants violated their fiduciary duties to plaintiff.

The defendants have appealed and present two issues: (1) "Whether the trial court erred in finding that the plaintiff was economically damaged and awarding such damage," and (2) "Whether the trial court erred in awarding punitive damages."

The plaintiff presents one issue: "Whether the amount of punitive damages was adequate under *Hodges v. S.C. Toof Co.*"

The Chancellor made extensive findings in this case, which are in pertinent part as follows:

1. Defendants Larry Cherry, Larry Cherry d/b/a Money Management Services, Larry Cherry, Trustee and Money Management Services, Inc. in their relationship with plaintiff Darlene Pridemore were engaged in an illegal debt adjusting business in violation of T.C.A. § 39-14-142.

. . . .

3. The debt adjusting business of the defendant was a practice of offering or attempting to act as an intermediary between debtors and creditors for the purpose of either selling, compounding or altering terms of payment of any debt of the debtor.

4. The Court finds that the defendant's attempt to argue that he was exempt from this statute because he was acting as a

___

1. Defendants will be referred to either by name, defendants, or appellants.

fiduciary is not well taken. The defendant is not exempt from this statute.

. . . .

6. Larry Cherry and Money Management Services were paid fiduciaries in relation to Darlene Pridemore, her property and her money. They undertook not only to invest and manage her money but to exercise complete control over her finances.

As a fiduciary, Larry Cherry and Money Management Services had a duty to act with regard to Ms. Pridemore's money and property solely in her interest and not act in self-interest or the interest of some other client.

7. Larry Cherry and Money Management Services violated that fiduciary duty by putting Larry Cherry in a position where his loyalties were divided.

8. Larry Cherry violated his fiduciary duty to Darlene Pridemore in his handling of the so-called sale to himself of Ms. Pridemore's house.

9. Larry Cherry, using money that belonged to another client, purchased Ms. Pridemore's house and took the title of the property in his own name.

10. Although he claimed to be holding the property in trust for another client, Doris Witthuhn, there was no recognized trust instrument, no trust agreement. All public and private records show that Mr. Cherry was the owner of the house.

11. The scheme by which Larry Cherry obtained title to Ms. Pridemore's house also involved Ms. Pridemore continuing to pay all expenses, including the mortgage, interest, taxes and insurance on said house.

12. Larry Cherry purchased the property for approximately Seventy–Eight Thousand Dollars ($78,000.00), sold it for over Ninety–Four Thousand Dollars ($94,-000.00) and as a result of the mortgage payments paid by Ms. Pridemore the balance on the mortgage was reduced from Fifty–Four Thousand Dollars approximately ($54,000.00) to Fifty–One Thousand Dollars approximately ($51,000.00).

13. The contract entered into by Mr. Cherry and Money Management Services with Ms. Pridemore provided for a fee arrangement which was unclear. Such fee arrangement violated the fiduciary duty to explain clearly the fees, how the fees are arrived at and exactly what Mr. Cherry and Money Management Services was going to do. This the defendants failed to do and such failure was a violation of the fiduciary duty.

14. The Court finds that the defendants violated the fiduciary duty by insisting that Ms. Pridemore sell her house to Mr. Cherry without adequately explaining to her that by doing so she was not helping herself, but was in fact, taking on additional debt.

15. The Court finds that the defendants intentionally misrepresented material facts to Ms. Pridemore on which she justifiably relied on to her detriment. Such misrepresentations constitute fraud.

. . . .

██ This record reeks with the defendants' fraud and misrepresentation practiced upon the plaintiff. The defendants violated the fiduciary duty owed to the plaintiff in every way possible. As this court opined in *Gay & Taylor, Inc. v. American Casualty Company:*

It is universally recognized that an agent stands in a fiduciary relationship to his principal and is under a duty to be careful, skillful, diligent and loyal in the performance of his principal's business and that for a failure to so act he subjects himself to liability to his principal for any damages naturally and proximately flowing from the breach of duty.

*Gay & Taylor, Inc. v. American Casualty Co.,* 53 Tenn.App. 120, 123–24, 381 S.W.2d 304, 305 (Tenn.App.1963). The evidence does not preponderate against the finding that the plaintiff is entitled to recover $50,-000.00 compensatory damages, nor does it preponderate against the finding that plaintiff is entitled to punitive damages.

The defendant Larry Cherry represented to plaintiff that in order for her to get out of debt, she should turn over all of her income to him, that it was in her best interest to sell

her home to another of defendant Cherry's clients at a greatly reduced price, and that within two years she would be in a position to repurchase the home. Relying completely on defendant, plaintiff, for a period of two years, turned over all of her pay and other income and was given an allowance to purchase food and clothing for her children. She also conveyed her home to defendant Cherry as trustee.

Defendants manipulated the plaintiff into a vulnerable, totally dependent position, refused to put any of the agreement to allow her to repurchase the real estate in writing, refused to provide a written lease for rental of the house, and took title to plaintiff's home as an alleged trustee for another client without any agreement in writing. When the plaintiff attempted to repurchase her home, defendant Larry Cherry, in an effort to enforce his will on plaintiff, sought plaintiff's eviction for what he says was the purpose of "getting her attention." Defendant's actions verge on extortion, if not extortion.

Defendant Cherry's practice of taking money from one client, commingling it under a common fund for the purpose of loaning it out to other clients for automobile loans and mortgages and guaranteeing a 10% return, was, in effect, operating as a bank, albeit, an unregulated bank.

Defendants' conduct in this case is the result of fraud, misrepresentation, and manipulation of the plaintiff's finances, which caused plaintiff to lose her home and kept her in economic slavery. The evidence also established that defendant Cherry put $4,000.00 of plaintiff's money in a savings account, did not tell her about it, and then represented to her that she had no money when, in fact, she had $4,000.00 in the savings account. The defendants, through their fraudulent misrepresentation, induced plaintiff to sell her home to defendant Larry Cherry and gave him total control over her finances. Defendant Larry Cherry was in a fiduciary position, characterized by trust and reliance of plaintiff, and defendant Cherry manipulated the plaintiff into the position of complete vulnerability and submission.

The record fails to show that defendant Larry Cherry was anything other than com-

pletely indifferent to the harm that he was causing plaintiff. His motivation was to benefit himself and other clients. He refused to provide plaintiff with any documents and papers until he was forced to do so. Defendant acted out of nothing more than his own financial betterment, managing plaintiff's money in a way that caused her to be totally dependent on defendant. Once she was totally dependant, he cut her off without notice and left her in a worse position than she was in when she began her relationship with him. Defendant Cherry's misconduct continued for a period of five years. As this court has stated: "Because agents owe a duty to represent their clients' best interest, it is inherently inconsistent for agents to discharge their fiduciary obligations while acting simultaneously for themselves." *Wyner v. Athens Utils. Bd.*, 821 S.W.2d 597, 598–99 (Tenn. App.1991).

The defendants in this case do not recognize that they did anything wrong. Their consistent argument was that even if they had done everything they were accused of doing, "what is wrong with doing that." The record shows that even though plaintiff requested that defendant Cherry not discuss her private affairs with others, he felt free to discuss them with the plaintiff's mother. During the trial, defendant called the plaintiff's mother, who was "virtually on her death bed," to get her to testify against her daughter, in order to assist him in the lawsuit. The record also shows that defendant Cherry has attempted to intentionally arrange his business practices in order to avoid any regulation by or any registration with a government agency.

The defendant operated a very lucrative business; however, insofar as plaintiff was concerned, defendant operated his business in a dangerous, reckless, and fraudulent manner.

■ The Chancellor properly awarded punitive damages. The Supreme Court has specifically described the situations in which punitive damages are available. "In Tennessee ... a court may henceforth award punitive damages only if it finds a defendant has acted either (1) intentionally, (2) fraudulently,

(3) maliciously, or (4) recklessly. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). The trial court specifically found that defendants' actions "were intentional and fraudulent." There is ample evidence in the record to support that finding. The trial court, however, only awarded $25,000.00 in punitive damages, and we are of the opinion that the amount awarded is insufficient. The Supreme Court has given the courts of this state guidance in determining the proper amount of punitive damages, by listing factors to consider:

(1) The defendant's financial affairs, financial condition, and net worth;

(2) The nature and reprehensibility of defendant's wrongdoing, for example

(A) The impact of defendant's conduct on the plaintiff, or

(B) The relationship of defendant to plaintiff;

(3) The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;

(4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;

(5) The expense plaintiff has borne in the attempt to recover the losses;

(6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior;

(7) Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act;

(8) Whether, once the misconduct become known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and

(9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.

*Hodges v. S.C. Toof & Co.*, 833 S.W.2d at 901–02.

Based upon the enumerated factors, we find that the punitive damages award should be increased from $25,000.00 to $100,000.00. The record fully supports such an increase. Defendants' conduct in this case is reprehensible, and as such, plaintiff is entitled to punitive damages in the amount of $100,-000.00.

The judgment of the Chancellor is affirmed, as modified. The cause is remanded to the trial court for the entry of judgment in accordance with this opinion and for any further necessary proceedings. Costs on appeal are taxed to the defendants/appellants.

TODD, P.J., and CANTRELL, J., concur.